### (PRIZE.)

## The Dos Hermanos—*Green*, Claimant.

In prize causes, the evidence to acquit, or condemn, must come, in the first instance, from the papers and crew of the captured ship.

It is the duty of the captors to bring the ship's papers into the registry of the district court, and to have the examinations of the principal officers and seamen of the captured ship taken on the standing interrogatories.

It is exclusively upon these papers and examinations that the cause is to be heard in the first instance : If; from this evidence, the property clearly appears to be hostile or neutral, condemnation or restitution immediately follows : If the property appears to be doubtful, or the case suspicious, farther proof may be granted according to the rules which govern the legal discretion of the court.

If the parties have been guilty of gross fraud, or misconduct, or illegality, farther proof is not allowed, and condemnation follows.

Although some apology may be found in the state of peace which had so long existed previous to the late war, for the irregularities which had crept into the prize practice, that apology no longer exists; and if such irregularities should hereafter occur, it may be proper to withhold condemnation even in the clearest cases, unless the irregularities are avoided or explained.

If a party attempts to impose upon the court, by knowingly or fraudulently claiming as his own, property belonging in part to others, he will not be entitled to restitution of that portion which he may ultimately establish as his own.

It seems that where a native citizen of the United States emigrated before a declaration of war to a neutral country, there acquired a domicil, and afterwards returned to the United States during the war and re-acquired his native domicil, he became a redintegrated American citizen; and could not afterwards, *flagrante bello*, acquire a neutral domicil by again emigrating to his adopted country.

The claimants have no right to litigate the question whether the captors were duly commissioned; the claimants have no *persona standi in judicio* to assert the rights of the United States : But if the capture be made by a non-commissioned captor, the prize will be condemned to the United States.

APPEAL from the district court for the Louisiana district.

This was the case of a Spanish schooner captured on the 18th of October, 1814, by Mr. Shields, a purser in the navy, commanding an armed barge, in the service of the United States, ostensibly bound with a cargo of crates and dry-goods, on a voyage from Jamaica to Pensacola, but in fact in pursuance

of an asserted change of destination, then in prosecution of a voyage to New-Orleans. The schooner was delivered up, and prize proceedings were instituted against the cargo, in the district court for Louisiana district. Upon the return of the monition various claims were interposed for small adventures or parts of the cargo; but the only questions before the court arose upon the claim of Mr. Basil Green, calling himself a citizen of the Republic of Carthagena, who, by his agents, Mr. John F. Miller and Messrs. Lewis & Lee, asserted an ownership to nearly the whole of the cargo. Mr. Miller, in his affidavit annexed to the claim, states, " that he purchased the goods so claimed, with moneys in his hands belonging to the claimant; that at the time of the purchase, he expected to have had an interest therein, but that on his arrival at New-Orleans, the attorney in fact of the said claimant (meaning Mr. Lewis) refused to allow any such interest, and the deponent is therefore obliged to give up the same; and this deponent further saith, that the facts contained in the said claim are true to the best of his knowledge, information, and belief." At the hearing in the district court, the claim was rejected, and the goods were condemned as the property of enemies, or of citizens trading with the enemies of the United States.

Feb. 11th.

Mr. *Harper*, for the appellant and claimant, argued, upon the facts, that the proprietary interest in the cargo was in the claimant, and that he (though a native citizen) had a right to change his domicil, and did change it *bona fide* to Carthagena, in South Ame-

rica, where he was a resident merchant, and in his neutral character had a right to trade with the enemy of his native country.[a] He further suggested that the captor was not duly authorized to capture, there being no evidence that the armed barge, which made the capture, was duly incorporated into the navy.[b]

Mr. *Key*, contra, argued that the residence of the claimant at Carthagena was temporary only, and that the whole transaction was infected with fraud and falsehood.

Mr. Justice STORY delivered the opinion of the court.

Before we consider the merits of this claim it may not be unfit to advert to some of the principles applicable to proceedings in prize causes, which seem to have been wholly neglected in the progress of this cause.

It is the established rule in courts of prize, that the evidence to acquit or condemn must, in the first instance, come from the papers and crew of the captured ship. On this account it is the duty of the captors, as soon as practicable, to bring the ship's papers into the registry of the district court, and to have the examinations of the principal officers and

---

*a* 1 *Wheat.* 65, note (*i.*)

*b* 5 *Rob.* 41. The Melomasne. *Ib.* 252. The Charlotte. *Ib.* note (*a.*) The Island of Curraçoa, &c.

seamen of the captured ship taken before the district judge, or commissioners appointed by him, upon the standing interrogatories. It is exclusively upon these papers and the examinations, taken *in preparatorio*, that the cause is to be heard before the district court. If, from the whole evidence, the property clearly appear to be hostile, or neutral, condemnation or acquittal immediately follows. If, on the other hand, the property appear doubtful, or the case be clouded with suspicions or inconsistencies, it then becomes a case of farther proof, which the court will direct or deny, according to the rules which govern its legal discretion on this subject. Farther proof is not a matter of course. It is granted in cases of honest mistake or ignorance, or to clear away any doubts or defects consistent with good faith. But if the parties have been guilty of gross fraud or misconduct, or illegality, farther proof is not allowed; and under such circumstances, the parties are visited with all the fatal consequences of an original hostile character. It is essential, therefore, to the correct administration of prize law, that the regular modes of proceeding should be observed with the utmost strictness; and it is a great mistake to allow common law notions in respect to evidence or practice, to prevail in proceedings which have very little analogy to those at common law.

These remarks have been drawn forth by an examination of the present record. The court could not but observe with regret that great irregularities had attended the cause in the court below. Neither were the ship's papers produced by the captors, nor

the captured crew examined upon the standing interrogatories. Witnesses were produced by the libellants and the claimant indiscriminately at the trial, and their testimony was taken in open court upon any and all points to which the parties chose to interrogate them, and upon this testimony and the documentary proofs offered by the witnesses, the cause was heard and finally adjudged. In fact there was nothing to distinguish the cause from an ordinary proceeding in a mere revenue cause *in rem.*

This court cannot but watch with considerable solicitude irregularities, which so materially impair the simplicity of prize proceedings, and the rights and duties of the parties. Some apology for them may be found in the fact, that from our having been long at peace, no opportunity was afforded to learn the correct practice in prize causes. But that apology no longer exists; and if such irregularities should hereafter occur it may be proper to adopt a more rigorous course, and to withhold condemnation in the clearest cases, unless such irregularities are avoided or explained. In the present case the first fault was that of the captors; and if the claimant had suffered any prejudice from it, this court would certainly restore to him every practicable benefit. But in fact no such prejudice has arisen. The claimant has had, in the court below, the indulgence and benefit of farther proof and of collateral aids to verify the truth of his claim; and he stands at least upon as favourable a ground to sustain it as if the cause had been conducted with the most scrupulous form.

Two questions have been argued at the bar. First,

whether Mr. Basil Green, the asserted owner, has established his proprietary interest in the goods in question; and secondly, supposing this point decided in his favour, whether he has proved himself a neutral merchant, entitled by his domicil and national character to a restitution of the property.

It appears by the evidence in the case that Mr. Green was born in Maryland, and resided in that state, and principally at Baltimore, until the year 1809, when he went abroad. In 1811 he resided in Carthagena; and in the spring of 1813, he came to New-Orleans from Carthagena, in a schooner under Carthagenian colours, and being unable to sell her, he determined, in connexion with Messrs. John F. Miller, Lewis & Lee, and others, inhabitants of New-Orleans, who became jointly interested with him, to fit her out as an American privateer. Accordingly, on or about the 13th of March, 1813, Mr. Green applied to the collector of the customs at New-Orleans for a commission; and in his petition he described her as the private armed schooner Hornet, of New-Orleans, owned by Basil Green. The commision was granted, and soon afterwards Mr. Green sailed in the privateer on her destined cruise. In June, 1813, he was, as he alleges, compelled by a mutiny of the crew to go to Carthagena, where they deserted, and the cruise was broken up, and the privateer was finally sold; of all which he gave information to the other owners at New-Orleans, and promised to remit their proportions of the proceeds. While at New-Orleans in April, 1813, Mr. Green executed a letter of attorney, appointing Messrs. Lewis

& Lee of that city, his general attornies and agents, and in this power he described himself, as " Basil Green, of Baltimore, merchant." He does not appear since that period, to have returned to the United States. In July, 1814, he was a resident at Carthagena, and is described by one other witness, as having a house and store there. Such are the most material facts respecting Mr. Green's domicil apparent on the record.

In respect to the proprietary interest in the goods claimed by him, the evidence is more complicated. The whole adventure was conducted by Mr. John F. Miller, of New-Orleans, (one of the proprietors of the Hornet,) from whose testimony it appears, that the owners of the Hornet, resident at New-Orleans, having received information of her sale, and being desirous of receiving their funds, he, Miller, on his own account, and as their agent, determined to make a voyage to Carthagena for this purpose. He accordingly in June, 1814, went from New-Orleans to St. Jago de Cuba, and from thence to Jamaica, (as the only practicable route,) and from thence to Carthagena. When he left New-Orleans, he took a draft from Messrs. Lewis & Lee on Mr. Green, for 2,500 dollars, and a letter from the same gentlemen to Messrs. O'Hara & Offley, merchants at Jamaica, authorizing them to pay him the balance of their accounts, whatever it might be. At Carthagena, in August, 1814, he received from Mr. Green, the sum of 1,500 dollars and 50 cents, in part of the draft of Messrs. Lewis & Lee. He also received from Mr. Green the whole of the nett pro-

ceeds of the sale of the Hornet, amounting to the sum of 11,636 dollars, of which his own share amounted to 1,500 dollars, and that of Mr. Green, to 4,129 dollars and 2 cents; and he gave a receipt to Mr. Green for this amount, promising, on his arrival at New-Orleans, (sea risks and captures excepted,) to pay over to the stockholders their respective proportions, deducting all necessary charges. Mr. Green directed his share to be remitted to his nephew at Baltimore, by written instructions contained in a letter directed to Mr. Miller, as follows: "Carthagena, August 12, 1814, Mr. John F. Maler. My dear sir—On your safe arrival in the New-Orleans, sea risks and captures excepted, you are authorized and appointed, at my wish, in which you will please to remit on to my nephew, Mr. George A. Stamp, of Baltimore, the sum of 4,129 dollars and 2 cents, after deducting the charges thereon, and you will much oblige your friend—Respectfully—B. Green." On the 29th of August, Mr. Green addressed a letter to his nephew, in the following paragraph: "Mr. John F. Miller, a particular friend of mine, will remit on to you, in good bills, after his safe arrival in New-Orleans, the sum of 4,129 dollars and 25 cents, agreeable to his receipt on the same, now in my possession. Perhaps he may remit you a 1,000 or 1,500 dollars more, if fortune favours his prospects." At what period Mr. Miller left Cartnagena, does not precisely appear, but he says, that he thinks it was before the 20th of August, and that the letter of the 29th of August, was sent to him at Jamaica. Previous

to his departure, he further asserts, that Mr. Green gave him verbal instructions to lay out his share of the money in goods, at Jamaica, instead of remitting it to his nephew, and also by a written authority, under date of the 12th of August, authorized him, if he thought proper, to draw on him for the further sum of 2,500 dollars, at five days sight. From Carthagena, Mr. Miller went to Jamaica, where he endeavoured to purchase a small vessel; but failing in his object, he, on the 9th of September, 1814, chartered the Spanish schooner Dos Hermanos, Captain Delgado master and owner, then lying at Kingston. By the charter-party, which was made by Messrs. O'Hara & Offley, on behalf of the owner of the one part, and Mr. Miller of the other part, it was agreed that the sum of 1,500 dollars should be given for the charter of the vessel for a voyage from Kingston to Pensacola, in West Florida, and back again to Kingston. That after her arrival at Pensacola, Mr. Miller should put on board, within 18 days, a return cargo of the produce of the country, to be consigned to Messrs. O'Hara & Offley for sale; and should further invest the amount of the freight in cotton or tobacco, on account of Mr. Delgado, and ship it on the return voyage, freight free, unless, it occupied more than a stipulated portion of the room of the vessel. Mr. Miller was further to pay all port charges, and in case of detention beyond 18 days, demurrage, also, at the rate of 16 dollars per day. And it was further agreed, that if the situation of that part of the world should be such as to preclude any communication between New-Orleans and Pen-

sacola, and prevent Mr. Miller from procuring a full return cargo or as much cotton and tobacco as should be required for the amount of the charter, then the said amount of 1,500 dollars was to be paid over on account of the said O'Hara & Offley, to Mr. John K. West, of New-Orleans; and in that event, and payment of all port charges, Miller was to be at liberty to decline loading the vessel on the return voyage. Immediately after the execution of this charter-party, Mr. Miller loaded on board of the schooner the goods in question, through the agency of Messrs. O'Hara & Offley; and drew a bill for 2,500 dollars in their favour, on Mr. Green, and received from them, for the account of Messrs. Lewis & Lee, the sum of 900 dollars. The whole cargo, with an inconsiderable exception, was documented as the property of a Don Juan Lesado, of Pensacola, and purported to be the proceeds of the sales of a former cargo consigned by him to Messrs. O'Hara & Offley. Among these documents, which are asserted by the claimant to be merely colourable, there is an invoice account current of the sales of a supposed former cargo; and a letter of advice, stating that the schooner was chartered for the voyage on account of Don Juan Lesado, and that the cargo, consisting of dry goods, was a return cargo purchased by his orders. There is, also, a bill of lading consigning the cargo to the same person. Mr. Miller alleges this artifice to have been resorted to to preserve the shipment from British and Spanish capture. The schooner sailed on the voyage about the 13th of September, with Mr. Miller on board,

and having been driven by currents considerably to the westward of Pensacola, and being in the Bay of St. Bernard, Mr. Miller left the schooner about the first of October, in a boat, which he had purchased at Jamaica, for the purpose, and proceeded for New-Orleans, leaving the property under the control and directions of a Mr. Bassett, who was a passenger on board. On the 13th of October, Mr. Miller arrived at New-Orleans. In the meantime the schooner proceeded to Dauphin Island, and there Mr. Bassett undertook (as he alleges) to change the destination, and determined to proceed to New-Orleans; and, for this purpose, on the 14th of October, 1814, he entered into a new charter-party in behalf of Mr. Miller, by which it was agreed between Mr. Bassett, as agent of Mr. Miller, and Captain Delgado for himself and Messrs. O'Hara & Offley, that for the additional sum of 1,100 dollars, the vessel should immediately proceed from Dauphin Island for the Bayou St. John, near the city of New-Orleans, and there deliver the said cargo to Mr. Miller, his agents or assigns. The schooner was soon afterwards captured by the libellants, detained in the Bay of St. Lewis, and subsequently brought to Petit Coquille. After his arrival at New-Orleans, and before knowledge of the capture, Mr. Miller wrote the following letter to Mr. Bassett :— " New-Orleans, 15th of October, 1814. Dear sir, I arrived here on the 15th in the morning, after 12 days suffering, and found all my family as well as could be expected from the situation of this place and Pensacola. I have thought proper to remain

1817.

The Dos
Hermanos.

without doing any thing until I hear of your arrival, and news from you. I would advise, by all means, to fetch the vessel and cargo to Mobile point, if no farther, if possible. I believe it can be done without much or no danger. I believe, also, it is practicable to procure a permission from the English commander to come to New-Orleans with the schooner, provided you promise to return with provisions that they stand in need of. Try every means in your power to effect the arrival here of yourself and schooner. Should you get the schooner here, I shall meet a ready sale for the crockery ware, and the schooner a ready despatch. Blankets sell ready at nine dollars per pair. Try and make arrangements with Delgado to fetch the schooner here, as it is certainly greatly to his advantage as well as ours. I depend upon your known activity, and remain your friend. In haste, the vessel is about to sail.               (Signed.)      JOHN F. MILLER.

P. S. All those pirates are destroyed at Barataria. Tobacco, best quality, six cents, dull.

(Signed.)                          MILLER.

I have not time to write to Delgado, but will next opportunity. Should you not have consigned the schooner and cargo to any person, you may place any confidence in Mr. Joseph Moreiga, as I know him well."

Mr. Miller asserts that he brought a considerable sum of money in dollars and doubloons from Jamaica, of which he took 4,500 dollars, when he left the schooner, in the boat, for New-Orleans, and the residue, amounting to about 18 or 1900 dollars, which was stored away in several crates of

goods, he afterwards contrived to obtain from the schooner in the night time while she lay at Petit Coquilles. All the letters brought in the schooner from Jamaica were taken by Mr. Miller, and all the documents respecting the cargo came from his hands during his several examinations in court.

Sᵉ ch is the general outline of the case, as to the question of proprietary interest in the goods claimed in behalf of Mr. Green. An examination of some other minute, though important particulars, will properly arise in the subsequent discussion of this question.

The first thing that strikes us on the slightest survey of this cause, is the total absence of all documentary proof to establish the claim of Mr. Green. The shipment was made in the enemy's country in the name of an enemy, and ultimately destined for sale at Mobile or New-Orleans, if the parties should be able to accomplish the voyage. The property was clothed with a Spanish character, as Mr. Miller asserts, to protect it from British and Spanish capture. It is certainly the duty of neutrals to put on board of their ships sufficient papers to show the real character of the property, and if their conduct be fair and honest, there can rarely occur an occasion to use disguise, or false documents. At all events, when false or colourable documents are used, the necessity or reasonableness of the excuse ought to be very clear and unequivocal to induce a court of prize to rest satisfied with it. To say the least of it, the excuse is not, in this case, satisfactory; for the disguise is as strongly pointed to elude American, as

British or Spanish capture. It is not pretended that any genuine papers were put on board, or are now in existence, which would explain the circumstances; for Mr. Miller himself, in an answer to an interrogatory on this point, says he had from Mr. Green no written instructions, nor did he enter into a written contract with Mr. Green respecting the goods to be purchased at Jamaica; that Mr. Green would have given written instructions, but he, Mr. Miller, objected to it, as in case of capture it would have been insecure. He adds, that there are no letters or papers at Carthagena that can throw any light on this subject, and that not having received any, he was unwilling to leave any.

In the next place, there is not, with the exception of Mr. Miller's, the slightest testimony from the ship's crew that the property belonged to Mr. Green. The master and mate of the schooner, and Mr. Bassett also, the agent of Mr. Miller, expressly state, that they always believed Mr. Miller to be the real owner, and that he never named any other person to them as the owner, though he sometimes alluded darkly to a possible ownership in others. It is a general rule of the prize law, not to admit claims which stand in entire opposition to the ship's papers, and to the preparatory examinations, where the voyages have originated after the war. The rule is founded upon this simple reason, that it would open a door to fraud in an incalculable extent, if persons were not required to describe their property with perfect fairness. The rule, however, is not inflexible; it yields to cases of necessity, or where,

by the course of the trade, simulated papers become indispensable, as in a trade licensed by the state with the public enemy. It may be said, that the rule cannot be applied to the present case, because Mr. Miller is to be deemed one of the ship's crew, although he had, some time before the capture, left the vessel, and was, at the time of capture, at New-Orleans; and that his examinations (for he was examined several times) established the interest of Mr. Green, and so the claim is consistent with what ought to have been the evidence *in preparatorio*. Assuming this argument to be correct, on which we give no opinion, the circumstances of this case call for the most plenary explanations to dissipate the doubts which cannot fail to be awakened.

These explanations come altogether from Mr. Miller, and are unsupported by any corroborative documents, or facts asserted upon independent testimony. All that the other principal witnesses have testified to, which bears directly on the cause, consists of declarations or confessions, or acts of Mr. Miller, after his return to New-Orleans. Mr. Miller himself certainly stands in a predicament which does not lend additional credit to his assertions. He was the projector of the voyage, and the conductor of all its operations. He chartered the vessel in *his own name*; and if he was acting for Mr. Green, and not for himself, what motive could there be for him to conceal his agency from Messrs. O'Hara & Offley, or from Captain Delgado? The voyage itself was illegal in an American citizen. The charter-party

stipulated for a return cargo to Jamaica, which was to be furnished by Mr. Miller, and he does not pretend that this cargo was to have been shipped on Mr. Green's account. It must have been a traffick on his own account, or a joint concern with Messrs. O'Hara & Offley; and in either view was a surrender of all the obligations which he owed to his country. These considerations cannot certainly increase our confidence in the integrity of the conduct of Mr. Miller.

On examining his testimony there are many circumstances which cannot fail to create unfavourable doubts. The test affidavit itself is couched in very equivocal language. Mr. Miller there asserts, that at the time of the purchase he expected to have an interest in the goods, but that on his arrival at New-Orleans, the attorney in fact of the claimants refused to allow any such interest, and the deponent was obliged to give up the same. What authority could Mr. Lewis, the attorney here alluded to, have to intermeddle with Mr. Miller's interest in the shipment? He was not the consignee of the property, nor was he confidentially acquainted with any agreement or instructions of Mr. Green relative to the voyage. It is scarcely credible that the real consignee of the goods, having an interest in them, should, under such circumstances, yield it up to a mere intruder. In his examination in chief, Mr. Miller states, that it was his original intention to have invested his own funds, as well as Mr. Green's, at Jamaica; but he was induced to abandon it by reports that the British intended to occupy Pensacola

and Mobile Point; and he explains his interest in the shipment to have been only a right to one third of the profits in lieu of commissions.

This representation is not consistent with the language held by Mr. Miller on other occasions. After the capture Mr. Miller stated to Captain Delgado, that " he had got himself into a difficulty in consequence of his (Delgado's) coming here; that the *greater part of the funds invested in the goods belonged* to Mr. Green; that he (Miller) was acting for others, and that he feared he should get himself into difficulty." Upon an inquiry from the same person during the voyage from Kingston, whether he was the owner, Mr. Miller answered, " that he did not know—that he had funds from Carthagena." On another occasion, Mr. Miller gave another witness, (Mr. M'Ilvaine) to understand, " that the cargo was purchased on his (Miller's) and Green's account." And in a conversation with a Mr. West, who was the confidential agent of Messrs. O'Hara and Offley, and received a letter by the schooner advising him of the voyage, he left the impression on Mr. West's mind that the cargo was his own. The language, too, that Miller held with Mr. Heins, (the mate of the schooner,) after the capture, is very significant. He said, " It was a hard case that he should lose his property in that way; that it was the earnings of many years."

There are some other discrepancies in the declarations of Mr. Miller, which are not easily to be accounted for. Mr. Miller, in his examination, states, that Mr. Green authorized him to invest in goods

the money belonging to him; and that after he char-
tered the schooner it was his intention to lay out
Mr. Green's funds, as well as his own, in the pur-
chase of goods; but that subsequent events induced
him not to lay out his own funds, and that he laid
out for Mr. Green about 6,000 dollars only.   In
his conversation with Mr. Lewis he stated, that there
was an arrangement between Mr. Green and him-
self; that if he thought proper upon his arrival at
Jamaica, he might invest in goods the whole of the
11,686 dollars, and more, (for which he was author-
ized to draw on Mr. Green, if necessary,) on the
joint account of himself and Mr. Green; that after
his arrival at Jamaica he thought he would enter
into this speculation; and, thereupon, he drew upon
Mr. Green for 2,500 dollars; and that after the
draft was made he discovered that he had not any
right to make this disposition of the funds of the
stockholders in the Hornet, and, accordingly, he laid
out 6,000 dollars of Mr. Green's money, supposing
he ought to have an interest in it himself, as a com-
pensation for his trouble.

In determining the real character of this whole
transaction it becomes material to ascertain the true
value of the cargo shipped by Mr. Miller.   He as-
serts it to be about 6,000 dollars; but no original in-
voice, or other genuine paper is produced to prove
its cost at Jamaica.   According to Mr. Bassett, it
was worth about 7 or 8,000 dollars; and Capt. Del-
gado says, that while lading it, Mr. Miller told him
it would amount to about 8 or 10,000 dollars.   If
their cargo cost but 6,000 dollars, it may be asked,
what became of the residue of the money in the

hands of Mr. Miller? According to his own account, he received for the sales of the Hornet 11,636 dollars; from O'Hara & Offley 900 dollars; and he drew a bill on Mr. Green, in part payment of the goods, for 2,500 dollars, making in the whole, the aggregate sum of fourteen thousand dollars. There remained, therefore, after the purchase of the goods, in the hands of Mr. Miller, about 8,000 dollars. What has become of this fund belonging to himself and the stockholders in the Hornet? Here, as indeed in every other material part of the cause, the explanation comes exclusively from Mr. Miller. He says, that when he left the schooner in St. Bernard's Bay, he took away with him in the boat the sum of 4,500 dollars; and that while the schooner lay at Petit Coquilles, he took away from some crates on board of the schooner, in which it was concealed, the further sum of 18 or 1900 dollars. It is true that Captain Delgado says that when Miller left the schooner he took away with him a bag, which, he supposes, contained dollars, but he does not pretend even to guess at the amount; and it is remarkable, that none of the passengers are interrogated on this subject. But the statement in relation to the 18 or 1900 dollars is wholly incredible. The mate flatly denies that it could have been taken out of the crates in the manner which Miller asserts; and Mr. Bassett manifestly considers it almost impossible. What adds to the incredibility of the statement is, that when Mr. Miller left the schooner, he never informed Mr. Bassett that there was any money concealed in any of the crates, although he expressly constituted him his agent to dispose of the cargo, without any reserve.

If the funds were brought to New-Orleans in money, as Mr. Miller pretends, nothing could have been more easy of proof than the fact, considering that a large proportion of it belonged to the other stockholders in the Hornet. By the very terms of his receipt he was bound to pay over to them their respective proportions *on his* arrival at New-Orleans. Has he done so? There is not the slightest proof to this effect in the case. On the contrary, several of the stockholders, or their agents, have been examined, and not one of them admits his proportion to have been paid. Indeed, Mr. Miller himself admits that he has never paid any; and gives this extraordinary excuse, that he had orders from Mr. Green not to pay over the money until three months after his arrival at New-Orleans. This excuse is entirely at variance with the receipt given by Mr. Miller, and is as little reconcilable with the letter of Mr. Green to his nephew, respecting his own remittance. It may be added, that the statement itself has very little intrinsic probability to support it.

It is, therefore, no harshness to declare, that the declarations of Mr. Miller, that he brought home so very considerable a sum, are not of themselves entitled to much credit, and, under the circumstances, cannot be received as satisfactory evidence of the fact by this court; and if so, then every suspicion that the whole funds were invested in the cargo is greatly inflamed, and every doubt of the good faith of the present claim materially strengthened.

There are many other circumstances in the case which tend to a discredit of the claim; but it would

occupy too much time to discuss them minutely. One
circumstance, however, deserves particular notice. It
is the letter of Mr. Miller written to Mr. Bassett, after
his arrival at New-Orleans, which may almost be said
to carry, in every line of it, the language and feelings
of an owner of the goods.　And it adds no incon-
siderable force to these observations, that the only
documents on board pointing to Mr. Green, are in-
consistent with the supposition that the goods were
purchased on his account; and the only doubtful ex-
pression in them may well be satisfied as referring to
money to be obtained by Mr. Miller, from a Mr.
Hardy, of Jamaica, who was indebted to Mr. Green.

Considering, then, that the present claim rests al-
together upon the testimony of Mr. Miller, given by
him after he well knew the form and pressure of the
cause, and liable, as it must be, to the strongest.
doubts, both from the predicament in which he stands,
and the circumstances which have been already sta-
ted, the court cannot admit that it is supported by
any reasonable evidence.　It is not material in our
view, whether the property belonged wholly to Mr.
Miller, or to him jointly with Green, or was pur-
chased with the funds of the stockholders of the
Hornet, on his own account, as an unauthorized spe-
culation, or on joint account with their authority; for
in either case it is liable to the same judgment.　It
is a settled rule of this court, that if a party will at-
tempt to impose upon the court by knowingly or
fraudulently claiming as his own property belonging.
in part to others, he shall not be entitled to a resti-
tution of that portion which he may ultimately es-

tablish as his own. This rule is founded in the purest principles of morality and justice, and would bear upon the claim of Mr. Green, supposing his domicil, as a neutral, were ever so clearly established.

In respect to the domicil of Mr. Green, there is certainly much reason, to doubt if it would be sufficient to protect him, even if he could show himself at the time of the capture, a citizen of Carthagena. For, if upon his return to New-Orleans after the war, he acquired a domicil there, (of which, the circumstance of his becoming the owner of a privateer in that port, affords a strong presumption,) he became a redintegrated American citizen, and he could not, by an emigration afterwards, *flagrante bello*, acquire a neutral character so as to separate himself from that of his native country.

The counsel for the claimant, aware of the pressure of his case upon the present evidence, has prayed to be admitted to make farther proof, which he states to be now in his possession. If this cause turned upon the question of domicil, the court would feel little hesitation in admitting it. But considering the manner in which the cause was conducted in the court below, and that the claimant there had the benefit of farther proof, and that it appears to us that upon the question of proprietary interest, the cause now admits of no fair and reasonable explanation, consistent with an exclusive interest in Mr. Green, we do not feel at liberty to make an order for farther proof. We are not satisfied that it would be a safe or convenient rule, unless, under very special circumstances, to allow parties who have had the bene-

fit of plenary proof in the court below, to have an order for farther proof in this court upon the same points.   Much less should we incline to allow it in a case of pregnant suspicion, where the evidence must come from sources tainted with so many unwholesome personal interests, and so many infusions of doubtful credit.

The claim of Mr. Green must, therefore, be rejected, and the goods be condemned as good and lawful prize.

It has been urged, that there is no evidence upon the record that the captors were duly commissioned, and that farther proof ought to be required on this point.  This, however, is a question which the claimant has no right to litigate.   He has no legal standing before the court to assert the rights of the United States.   If the capture was without a commission, the condemnation must be to the United States generally; if with a commission, as a national vessel, it must still be to the United States, but the proceeds are to be distributed by the court among the captors according to law.   It will be time enough to require the commission to be produced, when the proceeds are to be distributed by the court, if the United States shall then insist upon any exclusive claim.

Decree affirmed with costs.[a]

Vide APPENDIX, Note I.

1817.

The Dos
Hermanos.