LING et al. v. 1,689 TONS OF COAL LYING ABOARD S. S. WILHELMINA IN HARBOR OF SEATTLE et al.

No. 14329.

District Court, W. D. Washington, N. D.

Oct. 7, 1942.

58

Jack McWalter, John D. McLauchlan, Jr., and Charles C. Hall, all of Seattle, Wash., for libelants.

Bogle, Bogle & Gates, and Edward G. Dobrin, all of Seattle, Wash., for respondent Jan Vollers, and Java-China Trading Co.

Hayden, Merritt, Summers & Bucey, and W. H. Hayden, all of Seattle, Wash., for petitioner J. Forster, Acting Consul of Kingdom of Netherlands in Seattle, Wash.

Rear Admiral Edward H. Campbell, of Medina, Wash., George E. Flood, of Seattle, Wash., and John H. Binns, of Tacoma, Wash., Prize Commissioners.

BOWEN, District Judge.

On December 7, 1941, the Steamship "Wilhelmina" with a Japanese owned cargo of 4500 tons of coal sailed from Muroran for Nagoya, Japan. The next day, upon learning through the vessel's radio of the outbreak of the present war in the Pacific, the master of the vessel deviated her voyage, and with the approval and assistance of the crew put the vessel and cargo into Dutch Harbor, Alaska, on December 26, 1941. On February 20, 1942, the vessel with a portion of the cargo arrived at Seattle.

For their assistance the crew were promised certain remunerations, but not having received the same they on April 7, 1942, filed this libel in this Court as a Court of Prize, seeking to condemn the cargo of coal as a prize of war captured by the crew and asking certain relief against the master as party respondent. The ship is not sued, and the chief officer, apprentice, and radio operator are not included among libelants or respondents.

Standing interrogatories *in preparatorio* have been answered and much testimony by deposition has been taken. The master and owner of the vessel and the Dutch Government have filed certain objections to the jurisdiction of the court, and the following questions are presented:

1. Does this an American Prize Court have jurisdiction?

2. Was capture of prize of war intended?

3. Was a lawful capture of prize of war made?

1. *JURISDICTION.* Since the commencement of this action, Congress has enacted the Act of August 18, 1942, Pub-

lic Law 704, 77th Congress, 34 U.S.C.A. § 1159 et seq. to facilitate the disposition of prizes captured during the present war. That Act suggests the inquiry whether libelants have under the Act acquired any rights not previously available to them, and counsel and the prize commissioners have discussed with the court the possible effects of the new Act on this case, particularly on libelants' right to proceed in this court.

If certain events necessary to this Court's jurisdiction had happened as provided in Section 7, 34 U.S.C.A. § 1165, such as a proclamation by the President making the provisions of the Act and a hearing in an American Prize Court available to the nationals of cobelligerent nations, that section might have validated libelants' proceedings for adjudication of prize in this an American Prize Court, but I am not advised of the happening of any such necessary event. No other provision of the Act gives libelants, who are citizens of our cobelligerent China, the right to submit their claim of prize to an American Prize Court. On that question of jurisdiction this court is, therefore, left to a consideration of the law as it was when this action was commenced on April 7, 1942.

The question of "Prize or no prize must be determined by courts of admiralty, belonging to the power whose subjects make the capture." 1 Magens, 496. "The proper and regular court for these condemnations is the court of that state to whom the captors belong." 1 Magens, 487. (Both of these Magens quotations appear in notes in 9 Fed.Cas. at page 61.) See also Findlay v. The William, 9 Fed.Cas. page 57, No. 4, 790, where at page 61 it was said "That affairs of prizes are only cognizable in the courts of the power making the capture." The Supreme Court in U. S. v. Peters, 3 U.S. 121, 126, 3 Dall. 121, at 126, 1 L.Ed. 535, held that "By the law of nations, the right of judging is vested in the courts of the captor." And Ruling Case Law states the rule thus: "In general this jurisdiction of the national courts of the captor, to determine the validity of captures made in war under the authority of his government, is exclusive of the judi-

cial authority of every other country." 15 R.C.L., Sec. 109, page 210.

Under those authorities, it would have been proper for libelants, who are Chinese citizens, to have submitted to a Chinese Court their allegedly captured prize and their cause for adjudication of prize. They do not, under those authorities or any others of which this court is advised, have the right to so proceed in this American Prize Court because of its lack of jurisdiction of prize sought to be condemned at the suit of nationals of a cobelligerent nation.

By all those connected with this case it is considered a novel one, and the prize commissioners suggest the importance of a decision as to whether under the disclosed facts the cargo constitutes a prize or no prize. If by reason of any conceivable theory or applicable authority this court should entertain jurisdiction, it would be necessary to determine that question of prize or no prize. That turns upon the further inquiry whether a capture was intended and whether there was a lawful capture of prize.

*2. WAS CAPTURE INTENDED?* That question involves a consideration of the acts and intentions of the master, officers and crew of the ship "Wilhelmina" connected with their bringing the vessel and her cargo into an American port. The evidence discloses that, without consulting any other officers or any members of the crew, Capt. Vollers, the master of the vessel, immediately after learning of the outbreak of war between Holland and Japan on December 8, 1941, decided to and did deviate the Japanese voyage the vessel was then on, and undertook of his own volition to bring the vessel and cargo into a friendly and safe American port, for the purpose of escaping capture by the Japanese of the master and crew and of securing greater safety for the vessel from the standpoint of the Dutch interests with the master was undoubtedly serving. In execution of this plan, the master changed the vessel's course to the eastward away from the course of her Japanese voyage.

After the master had thus effected his deviation of the vessel's voyage, he then

for the first time consulted with libelants who were the other officers and crew members of the vessel, and solicited and obtained their active assistance and participation in the master's plan. Some of the witnesses (including the second and third officers and chief engineer) testified in effect that the master told them he would try to get for them a bonus, war bonus, American wages, and "bonus in the price of the coal," "if we escape from the Japanese," "if we get away from the Japanese and turn the ship over to American authorities," and Third Officer Siang testified that Capt. Vollers at dinner (after the voyage was diverted and the crew agreed to cooperate in the Captain's plan) told him "we own all the coal and will get lots of money."

But one member of the crew, William R. Davies, apprentice, in telling of the Captain's promise of wages or bonus money and the date of such promise, testified:

"Q. Have you had any promises of any wage or bonus money? A. Well, not exactly promise, but I did hear something about getting some money. The Captain didn't promise but he said if we did try to escape he would try his best to see we got something for it.

"Q. When was that? A. On December 8, 1941, in the morning. He called us to the salon and he said 'Gentlemen, I think it is our duty to try to escape, all do our best to try to escape and I will try my best to get you a war bonus.'" (Deposition of William R. Davies, April 15, 1942, page 9.)

Chief Officer Sundquest testified in effect that at the time of the escape from Japanese waters he received no promise of any interest in the ship or cargo for assisting such escape, that his primary object in such escape was to save his own life, and that at Dutch Harbor Lieut. Breedveld of the Dutch Navy stated that Sundquist would receive a reasonable bonus. Wireless operator Ostroumoff in answer to the twenty-sixth interrogatory *in preparatorio* stated that he had not been settled with for his wages, but that he had not sustained any personal loss by the seizing and taking (alleged capture) of the ship, and that he had an understanding with the Captain to receive a war bonus. In his deposition Ostroumoff said that he had not made any demands upon the master for increased wages or war bonus, or for any interest in the cargo of coal.

At Dutch Harbor some of the "Wilhelmina's" coal was acquired by the U. S. Army and some of it was sold to a Russian vessel. For these transfers of the coal no money consideration was paid, but receipts were issued by the receiving authorities to the master of the "Wilhelmina" who sent the receipts to a representative of the shipowner, at San Francisco. The transfer of the coal from the "Wilhelmina" to the United States Army was arranged for in negotiations between a U. S. Army representative and the master of the "Wilhelmina," and the transfer of coal from the "Wilhelmina" to the Russian ship was initially arranged for in negotiations between government or military representatives of the Dutch and American governments. There is no evidence that libelants were consulted before these transfers were made.

After the delivery of some of the coal to the U. S. Army, and while the ship was still in Alaska, the crew accused the master of receiving cash payment for the discharged coal and of not paying any of it over to the crew on account of their back wages, bonus and whatever interest they then claimed in the coal, and although the master denied such accusation the crew went on strike and refused to discharge any more coal or bring the ship to Seattle, where the Dutch Government had ordered it be brought, unless the master sign a guarantee, which, in order to end the strike and bring the ship to Seattle, he did on February 4, 1942, sign in the following words: "This is to guarantee that the crew of the steamship 'Wilhelmina' will get a bonus from the confiscated coal, the remaining of six months salary and extra of war work bonus when the ship arrives at Seattle."

Although they went on strike against working cargo and sailing the ship because of non-payment of their wages and bonus, the crew members of the "Wilhelmina" now in this action claiming a prize interest in the cargo did not, either while the vessel was in Alaska or at any other time prior

to the commencement of this action, assert any dominion over the cargo, as might be expected of persons claiming a share in it as prize of war. There is no proof that the crew members undertook or intended on their own account, as distinguished from cooperating in the plan conceived and put into operation by the master, to capture or hold the vessel or cargo as prize of war. They merely acquiesced in the purpose and plan of Capt. Vollers to take the vessel and cargo out of Japanese waters into the safety of an American port and to thereby escape with Capt. Vollers from possible capture by the Japanese of the vessel and all non-Japanese persons on board.

It is not doubted that Capt. Vollers solemnly promised to *try* to obtain for the officers and crew payment of back wages, American scale wages after the deviation of the voyage, and a war bonus out of the cargo which doubtless the master intended to confiscate for the benefit of his Dutch principals or the Dutch Government, but the circumstances strongly indicate that capture of the cargo as prize of war for the benefit of the captors did not enter the minds of libelant crew members until after they arrived in Seattle and began to look for means of collecting their back wages, American scale wages and war bonus. The only plan disclosed or carried into effect concerning ship and cargo after the outbreak of the Pacific War was the plan of Capt. Vollers, the master. The object of his plan was to prevent the Japanese capture of himself and his non-Japanese crew as well as his vessel. His testimony does not disclose that he ever stated that he or any one else captured or intended to capture either vessel or cargo as a prize of war, although he did refer to the cargo as "confiscated coal" in his letter of February 4, 1942, which he signed, according to his testimony, in order to settle the crew's strike and get the vessel to Seattle from Dutch Harbor where he was told by a high officer of the U. S. Army that "the coal should be confiscated by the Dutch or American government." Very likely he would then have made known to that army officer the fact, if it had been the fact, that the cargo had been captured and was being held by the crew as a prize of war, but he then made no reference to a prize of war.

No witness stated that the cargo was captured as a prize of war. Among the witnesses who testified are not only the master and chief officer of the vessel, but also the second and third officers (who are Chinese and studied in an American nautical school in Shanghai) and the chief engineer, all of whom are experienced mariners and doubtless have some knowledge of the principle of prize of war. It is highly improbable that merely through inadvertence they all failed to testify as to a definite plan or intention to capture the cargo as prize if any such plan or intention ever existed.

When the vessel arrived at Dutch Harbor, and until the arrival there of Lieut. Breedveld of the Dutch Government and Navy, Capt. Vollers accepted directions from the U. S. Military authorities. However, upon Lieut. Breedveld's arrival and by that official's direction, Capt. Vollers on January 30, 1942, had entered in the vessel's log: "We are taken over by the Netherlands East Indies Government and awaiting orders." From this transfer to the Dutch Government no exception of the cargo was noted. Thereafter the ship and cargo, subject to sailing clearance by the U. S. Navy, were in charge of Lieut. Breedveld who instructed as to later movements including the removal to Seattle. To these occurrences the record discloses no objections from Capt. Vollers or libelants on the ground that the interests of any of them in a prize of war were being interfered with. Although at Dutch Harbor the crew went on strike and refused to discharge any more coal or to sail the ship to Seattle until Capt. Vollers signed the letter of February 4, 1942, guaranteeing the crew's " * * * bonus from the confiscated coal * * *," it is significant that the crew did not then or at any time before commencing this action demand or claim a share in the coal as a prize of war captured by them.

From the foregoing the court finds that no capture of the cargo as prize of war was intended.

**3. *WAS CAPTURE LAWFUL?***

If, however, intention to capture the cargo as prize did exist, we are still confronted with the further question whether such a capture was lawful under the circumstances in this case. In Brown v. United States, 8 Cranch 110, 12 U.S. 110, at page 135, 3 L.Ed. 504, Justice Story, dissenting on other grounds, observed " * * * that the true doctrine of the law of nations, found in foreign jurists, is, that private citizens cannot acquire to themselves a title to hostile property, unless it is seized under the commission of their sovereign; and that, if they depredate upon the enemy, they act upon their peril, and may be liable to punishment, unless their acts are adopted by their sovereign." And further at page 133, of 12 Cranch the writer Puffendorf was quoted as saying: " * * * so that all a private adventurer in war can pretend to, is no more than what his sovereign will please to allow him; for to be a soldier and to act offensively, a man must be commissioned by public authority." Although, where jurisdiction clearly exists on another ground (such as, that an American captor may sue in an American prize court, a ground not applicable here), the claimant owner will not be heard to question for the United States whether there was public authorization of the capture (The Dos Hermanos, 2 Wheat 76, 15 U.S. 76, 99, 4 L.Ed. 189; The Amiable Isabella, 6 Wheat 1, 19 U.S. 1, 66, 5 L.Ed. 191), the above quoted statements from Story and Puffendorf are sound in principle and seem to be still the law. There is no proof in this case that any government, either Dutch, Chinese or American, has authorized or ratified any capture of this cargo as a prize of war. In the absence of statute I see no legal basis for American authorization or ratification of such capture by Chinese or non-American captors. No lawful capture is shown here.

There is, therefore, in this case no prize, because there was no capture in fact or in law.

It has also been suggested that the court should consider whether or not the United States Government has any interest here, and, if so, what effect such interest has upon the issues here presented. I do not, however, believe that the court in a prize case, any more than any other case, is called upon to decide the interests of absent parties. The United States Government is not before the court in this case, because it has not submitted any question for the court's decision, is not made a party and has not appeared herein. There is, therefore, no authority for this court to, and it does not, pass upon any rights which the United States might have in the subject of this litigation.

After consideration of all three questions above discussed, the decision of this court is that the objections to the court's jurisdiction be sustained and it will be so ordered.

Other questions have been raised but the foregoing sufficiently disposes of the matter. Undecided issues common to this case and its companion cause are expressly reserved for decision in the latter cause.